**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **NATIONWIDE AGRIBUSINESS** | : | **CIVIL ACTION** |
| **INSURANCE COMPANY,** | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **NO. 06-1604** |
| | : | |
| **BARETT N. BYLER, et al.,** | : | |
| **Defendants** | : | |

........................................................................................................................

| | | |
|---|---|---|
| **THE BRETHREN MUTUAL** | : | **CIVIL ACTION** |
| **INSURANCE COMPANY,** | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **NO. 06-5421** |
| | : | |
| **BARETT N. BYLER, et al.,** | : | |
| **Defendants** | : | |

**M E M O R A N D U M**

**STENGEL, J.**                                                            **March 31, 2009**

These consolidated cases seek declarations of the rights, duties, and liabilities of

the parties under various insurance policies issued to Defendants Barett N. Byler and

Timothy Billig.  The Brethren Mutual Insurance Company has filed a motion for

summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  The

defendants have responded.  For the following reasons, I will deny the motion in its

entirety.

## I. BACKGROUND

### A. FACTS

These cases arise out of a motor vehicle accident that occurred on September 7, 2005, at the intersection of two public roads in Lynn Township, Lehigh County.  See Pl. Ex. A.  There were two vehicles involved in the collision: (1) a Dodge Caravan owned and operated by Defendant Martin Bennicoff; and (2) a GMC Sierra dump truck operated by Defendant Larry Cohick, Jr.  The dump truck was not owned by Byler or Cohick or anyone in their households.  See Cohick Dep. at 58-59; see also Byler Dep. at 16. Defendant George Billig is the registered owner of the dump truck.  See Pl. Ex. D; see also T. Billig Dep. at 66.  Neither Byler nor Cohick were in the business of selling, servicing, repairing, parking or storing automobiles.  See Cohick Dep. at 59.  The dump truck was not a bulldozer, forklift, a tractor or a cherry picker.  Id. at 62.  It was registered with farm license plates.  See T. Billig Dep. at 82, 87.  On the date of the accident, the truck was not operated on crawler treads, and there were no power cranes, shovels, loaders, diggers, road construction equipment, resurfacing equipment, raisers, scrapers or rollers permanently mounted on it.  See Cohick Dep. at 63.  The truck, bought from a private individual, had minor modifications.  The sandblaster was removed and replaced with a dump body box.  See B. Billig Dep. at 81.  The name, address, and telephone number of Billig Farms were printed on both doors of the dump truck for advertising purposes.  See Pl. Ex. G.

2

At the time of the collision, Defendant Cohick was driving the dump truck in the course and scope of his employment with Defendant Byler.  See Cohick Dep. at 9, 43. Cohick understood that corn silage was to be delivered to the Byler Farm and that he would be involved in its delivery.  Id. at 25.  Byler had purchased the silage from Defendant Dietrich who borrowed the dump truck from Timothy Billig to help with the delivery.  See Dietrich Dep. at 17; see also Byler Dep. at 12, 74.  On the day before the accident, some of Defendant Dietrich's other employees moved most of the loads of silage.  Defendant Dietrich asked Defendant Byler if one of his employees would be available to drive the truck the next morning to finish the job.  Id. at 43.  Byler offered the assistance of Defendant Cohick who was instructed to pick up the silage with the dump truck.  Id. at 45.  At his deposition, Cohick affirmed that the dump truck would drive along the cutting mechanism and the silage went into the truck while he drove it.  See Cohick Dep. at 65.  He indicated that the dump truck was used to transport or haul the silage and was not involved in the cutting process.  Id. at 64, 87.  The truck was also not used to store the silage or to prepare it to be used as feed.  Id. at 87.  Its purpose on that day was to haul the silage.  Id. at 78, 91.

Many of the defendants testified that the dump truck was regularly used in farm fields in the cultivation and harvesting of farm crops.  See Dietrich Dep. at 24-25; Byler Dep. at 23-24; Cohick Dep. at 63; T. Billig Dep. at 45-47, 86.  They described the process in which the truck was used in the harvesting of the silage:  Dietrich cut the corn silage

3

with his chopper, which brought the silage into the chopper and which was then blown

alternatively into the dump truck at issue here and another truck while in the field.  This

was performed while the trucks traveled alongside the chopper.  Once each truck was full,

it was driven from Dietrich's field to the Byler farm, where the truck would be unloaded

onto a walking table operated by a hydraulic motor driven from a tractor, which also

powered a blower that blew the silage into a silo owned by Byler.  See Dietrich Dep. at

24-25; Byler Dep. at 21; Cohick Dep. at 89.  The truck had been used several times for

this purpose.  See T. Billig Dep. at 91.  The chopper travels at a speed of approximately

three miles per hour in the field while the truck follows alongside at the same rate of

speed.  See Dietrich Dep. at 67.  According to the defendants, the dump truck was not

used solely to haul the silage, but was used for loading of the silage in the fields and for

the unloading of the silage at Byler's farm.  Id. at 24-25; Byler Dep. at 21; Cohick Dep. at

89.

          The defendants all agreed that the dump truck was used to haul silage, and other

sorts of farm product.  See Dietrich Dep. at 17, 74; Byler Dep. at 79; T. Billig Dep. at 20,

51, 85.  Dietrich testified, however, that he had borrowed the truck on ten prior occasions

to haul farm product, but generally the truck was used in the silage harvesting operation. .

See Dietrich Dep. at 74.  The dump truck was part of the harvesting operation and the

silage could not be harvested without either a truck or the use of a forage wagon.  Id. at

87-88.  Use of the forage wagon was less efficient because the silage deteriorated rapidly

4

each day in the field.  In four to five days it becomes too late to harvest.  Id. at 89, 100.

Defendant Cohick testified that the dump truck served a number of farming purposes and

that those purposes could include tasks both on a farm and on a public road.  See Cohick

Dep. at 78.  Cohick's testimony, and that of other witnesses, establishes that the dump

truck was used in the harvesting of silage several times.  See Dietrich Dep. at 24-25;

Byler Dep. at 21; Cohick Dep. at 31, 65-66, 88, 89, 90.

Contrary to the plaintiff's contention, Dietrich did not admit that the dump truck

was going to be used solely for hauling silage on the date of the loss.  He asked Billig to

borrow the dump truck because he was going to be hauling silage.  See Dietrich Dep. at

17.  His testimony, however, establishes that the dump truck was used in harvesting

operations wherein (1) the truck was driven simultaneously alongside of the chopper in

the farm field for the purpose of loading the silage, (2) after which the truck was driven

out of the field and driven to the Byler farm, (3) where it was unloaded and the silage was

blown into Byler's silo.  Id. at 25.  The harvesting of silage involved more than one

person and more than one vehicle, two trucks were needed to perform efficiently, and

trucks were needed that would come in and out of the farm field.  Id. at 65-67.

Dietrich also testified that his own stake body truck was occasionally borrowed by

Timothy Billig who used it to haul wheat, corn and soy beans.  Id. at 56.  However, in

contrast with Dietrich, Billig does not raise corn for the purpose of making silage and the

hogs raised on Billig's farm do not eat silage.  See T. Billig Dep. at 42.

5

Byler answered in the negative when asked if there was any reason to believe from his perspective that the Billig dump truck could not be used on the day of the accident for purposes of transporting the corn silage.  See Byler Dep. at 79.  His testimony established that the dump truck was repeatedly used in all facets of the harvesting operations, including onsite loading in Dietrich's farm field, travel to the Byler farm, and unloading of the harvested product onto the walking table for delivery to Byler's silo.  Id. at 21-25.

Timothy Billig testified that he observed Dietrich harvesting silage in the past and observed a truck moving alongside the chopper in the farm field where the silage was being loaded and that when one truck was full, another truck would take the full truck's place so that the operation of the silage harvesting could continue.  See T. Billig Dep. at 46.  When Billig borrowed Dietrich's International stake body truck, he used it to haul commodities off the farm.  Id. at 51.  He also testified that although he used the dump truck to haul commodities from the farm, he did not use it to haul produce to markets.  His tractor trailer is usually used for that purpose.  Id. at 80, 85-86, 94-95.

**B.  INSURANCE POLICIES**

**(1) Brethren's Business Auto Policy**

Brethren issued a Business Auto policy to Defendant Byler with a policy period from April 27, 2005 to April 27, 2006.  See Pl. Ex. N.  The policy states that coverage applies to "only those 'autos' described in item Three of the Declarations for which a premium charge is shown (and for Liability Coverage any "trailers" you don't own while

attached to any power unit described in item Three).  Id. at 1.  The only vehicle listed in item Three of the Declarations is a 2001 Ford F350 Truck.  Id.

The policy also offers the following coverage: "We will pay all sums an 'insured' legally must pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies, caused by an 'accident' and resulting from the ownership, maintenance or use of a covered 'auto.'  We will also pay all sums an 'insured' legally must pay as a 'covered pollution cost or expense' to which this insurance applies, caused by an 'accident' and resulting from the ownership, maintenance or use of covered 'autos.'  However, we will only pay for the 'covered pollution cost or expense' if there is either 'bodily injury' or 'property damage' to which this insurance applies that is caused by the same 'accident.'  We have the right and duty to defend any 'insured' against a 'suit' asking for such damages or a 'covered pollution cost or expense.'  However, we have no duty to defend any 'insured' against a 'suit' seeking damages for 'bodily injury' or 'property damage' or a 'covered pollution cost or expense' to which this insurance does not apply.  We may investigate and settle any claim or 'suit' as we consider appropriate.  Our duty to defend or settle ends when the Liability Coverage Limit of Insurance has been exhausted by payment of judgments or settlements."  Id. at 2.

The policy defines the term "insured" as follows: "(a) You for any covered 'auto.' (b) Anyone else while using with your permission a covered 'auto' you own, hire or borrow except: (1) The owner or anyone else from whom you hire or borrow a covered

'auto.'  This exception does not apply if the covered auto is a trailer connected to a covered auto you own.  (2) Your 'employee' if the covered 'auto' is owned by that 'employee' or a member of his or her household.  (3) Someone using a covered 'auto' while he or she is working in a business of selling, servicing, repairing, parking or storing 'autos' unless that business is yours.  (4) Anyone other than your 'employees,' partners (if you are a partnership), members (if you are a limited liability company), or a lessee or borrower or any of their 'employees, while moving property to or from a covered 'auto.' (5) A partner (if you are a partnership), or a member (if you are a limited liability company) for a covered 'auto' owned by him or her or a member of his or her household. (c) Anyone liable for the conduct of an 'insured' described above but only to the extent of that liability."  Id.  The term "auto" is defined as follows under the Business Auto policy: "'Auto' means a land motor vehicle, 'trailer' or semitrailer designed for travel on public roads but does not include 'motor equipment.'"  Id.

The Business Auto policy contains the following conditions in addition to the Common Policy Conditions: "We have no duty to provide coverage under this policy unless there has been full compliance with the following duties: …(b) Additionally, you and any other involved 'insured' must: . . (2) Immediately send us copies of any request, demand, order, notice, summons or legal paper received concerning the claim or 'suit'" Id. at 7.

### (2) Brethren's Farm Liability Policy

Brethren issued a Farm Liability policy to Defendant Byler with a policy period from May 1, 2005 to May 1, 2006.  See Pl. Ex. O.  The Farm Liability policy provides the following coverage: "We will pay those sums that the 'insured' becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies. We will have the right and duty to defend the 'insured' against any 'suit' seeking those damages. However, we will have no duty to defend the 'insured' against any 'suit' seeking damages for 'bodily injury' or 'property damage' to which this insurance does not apply. We may at our discretion investigate any 'occurrence' and settle any claim or 'suit' that may result." Id. at 1.  The policy defines the term "motor vehicle" as: "A motorized land vehicle, trailer or semitrailer: (a) designed for travel on public roads; or (b) used on public roads; unless it qualifies as "mobile equipment." Id. at 13.  "Mobile equipment" is defined in the policy as meaning "the following, including any attached machinery or equipment: (a) bulldozers, forklifts and tractors designed for use principally off public roads:  Other farm machinery designed for use: (1) principally off public roads; and (2) as implements for cultivating and harvesting; (b) vehicles while on premises you own or rent; (c) vehicles that travel on crawler treads, except that snowmobiles are 'mobile equipment' only while on an 'insured location' or any premises you own or rent; (d) vehicles, whether self-propelled or not, on which are permanently mounted: (1) power cranes, shovels, loaders, diggers or drills; or (2) road construction or resurfacing

9

equipment such as graders, scrapers or rollers; (e) vehicles not described in (a), (b), (c), or (d) above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types: (1) air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, light and well servicing equipment; or (2) cherry pickers and similar devices used to raise or lower workers; (f) vehicles not described in (a), (b), (c), or (d) above that are maintained primarily for purposes other than the transportation of persons or cargo." Id. at 13.

The policy continues: "However, self-propelled vehicles with the following types of permanently attached equipment are not 'mobile equipment' but will be considered 'motor vehicles:' (1) equipment designed primarily for:  (a) road maintenance, but not construction or resurfacing; or (b) street cleaning; (2) cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and (3) air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.  Id.

Brethren's Farm Liability policy contains the following relevant exclusions:  The insurance does not apply to "bodily injury" or "property damage" arising out of: . . . (2) the "maintenance, use, operation or 'loading or unloading' of any aircraft, 'motor vehicle.' motorized bicycle or tricycle by any 'insured' or any other person.  This exclusion does not apply to: (a) an aircraft that causes 'bodily injury' or 'property damage' to a 'residence employee' who is not operating or maintaining it;  (b) parking a

10

'motor vehicle' or motorized bicycle or tricycle on, or on the ways next to, premises you own or rent, provided the 'motor vehicle' is not owned by, or rented or loaned to you or the 'insured;' (c) a 'motor vehicle' not subject to motor vehicle registration by reason of its exclusive use as a device for assisting the handicapped; (d) a licensed recreational 'motor vehicle' owned by an 'insured,' provided the 'occurrence' takes place on the 'insured location;' (e) 'bodily injury' or 'property damage' arising out of the operation of any of the equipment listed in ¶¶ f(2) or f(3) of the definition of 'mobile equipment.'  Id. at 1, 2.

Brethren's Farm Liability policy includes the following conditions in addition to the Common Policy Conditions: "If a claim is made or 'suit' is brought against any 'insured,' you must: (1) immediately record the specifics of the claim or 'suit' and the date received; and (2) notify us as soon as practicable; you must see to it that we receive notice of the claim or 'suit' as soon as practicable.  Id. at 9.

Id. at 9.

## II.  STANDARD OF REVIEW

Summary Judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it might affect the outcome of the case under governing law.  Id.  The moving party must establish that there is no triable issue of fact as to all of the elements of any issue on which the moving party bears the burden of proof at trial.  See In re Bressman, 327 F.3d 229, 237-38 (3d Cir. 2003).

A party seeking summary judgment always bears the initial responsibility for informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Where the non-moving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case."  Id. at 325.  After the moving party has met its initial burden, "the adverse party's response, by affidavits or otherwise as provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  That is, summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. at 322.

A motion for summary judgment looks beyond the pleadings and factual specificity is required of the party opposing the motion.  Celotex, 477 U.S. at 322-23.  In

other words, the non-moving party may not merely restate allegations made in its pleadings or rely upon "self-serving conclusions, unsupported by specific facts in the record." Id.  Rather, the non-moving party must support each essential element of its claim with specific evidence from the record.  See id.

Under Rule 56, the court must view the evidence presented on the motion in the light most favorable to the opposing party.  Anderson v. Liberty Lobby, Inc., 477 U.S. at 255; see also Hugh v. Butler County Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005) (a district court analyzing a motion for summary judgment must view the facts in the light most favorable to the non-moving party and make every reasonable inference in favor of that party).  The court must decide not whether the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented.  Anderson v. Liberty Lobby, Inc., 477 U.S. at 252.  If the non-moving party has exceeded the mere scintilla of evidence threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent.  Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

**III.  DISCUSSION**

Pennsylvania courts interpret insurance contracts as a matter of law.  Home Ins. Co. v. Law Offices of Jonathan DeYoung, P.C., 32 F.Supp.2d 219, 223 (E.D. Pa. 1998).

13

The goal in interpreting an insurance contract is to ascertain the intent of the parties as manifested by the language of the written instrument.  The court must read the insurance policy as a whole and "its terms, when unambiguous, must be construed according to their plain and ordinary meaning."  Jacobs Constructors, Inc. v. NPS Energy Servs., 264 F.3d 365, 376 (3d Cir. 2001).  The policy's language should not be tortured to create ambiguities; rather, the policy should be read to avoid them, if possible.  Home Ins. Co., 32 F.Supp.2d at 223; see also St. Paul Fire & Marine Ins. Co. v. U.S. Fire Ins. Co., 655 F.2d 521, 524 (3d Cir. 1981).  Furthermore, the policy should not be rendered ambiguous by the mere fact that the parties disagree as to the proper construction.  See Pizzini v. Am. Intern. Specialty Lines Ins. Co., 210 F.Supp.2d 658, 667 (E.D. Pa. 2002).  Rather, a term is ambiguous only if it is reasonably susceptible to different constructions, is capable of being understood in more than one sense and is "obscure in meaning through indefiniteness of expression or has a double meaning . . ." Id.  Accordingly, in a declaratory judgment action requesting that the court provide the proper construction of an insurance policy, the first step is normally to determine whether the policy term in question is ambiguous.  St. Paul Fire and Marine Ins. Co. v. Lewis, 935 F.2d 1428, 1431 (3d Cir. 1991).  If the term is unambiguous, then it must be given its plain meaning.  On the other hand, terms in an insurance contract which are ambiguous are to be construed strictly against the insurer and in favor of the insured.  Id. (citing Mohn v. American Cas. Co., 326 A.2d 346, 351 (Pa. 1974)).  One stated rationale for the enforcement of this

principle is that insurance policies are not ordinary contracts but are contracts of adhesion between two parties who are not equally situated, and thus equity requires their interpretation in favor of the weaker party (i.e. the insured).  McMillan vs. State Mutual Life Assurance Company of America, 922 F.2d 1073 (3d Cir. 1990).

Brethren first argues that there is no coverage for the dump truck under the Business Auto policy it issued to Defendant Byler.  I agree.  The dump truck is not a covered auto because it is not a specifically described auto under the policy.  The coverage of the policy applies only to autos specifically described in item Three of the Declarations.  The only vehicle listed in that item is a 2001 Ford F350 Truck.  See Pl. Ex. N.  It was not the Ford F350 Truck involved in this accident, but the dump truck registered to and owned by Defendant Billig and driven by Defendant Cohick.  The dump truck was not owned by Byler or Cohick, or anyone in their households.  Accordingly, the dump truck is not a covered auto under the Business Auto policy issued by Brethren, and liability coverage under the policy does not apply.

Brethren next argues that Defendants Byler and Cohick do not meet the definition of an insured under the Business Auto policy it issued to Byler.  I agree.  An insured is defined as "[the policyholder] for any covered 'auto.'"  Defendant Byler, the policyholder, does not meet the definition of an "insured" under this policy because the vehicle involved in the accident was not a covered auto under the policy.

Defendant Cohick also does not meet the definition of an "insured" under the

Business Auto policy because (1) the vehicle involved in the accident was not a covered auto, (2) Cohick did not own the vehicle involved, (3) no one in Cohick's household owned the vehicle involved, and (4) Cohick was not in the business of selling, servicing, repairing, parking or storing autos.

The defendants suggest that the language of the policy in the definition of an "insured" implies that there may be more than one category of covered autos in this policy: those that are actually owned by the named insured and other vehicles such as "borrowed vehicles." They insist that the definition of who is an insured includes a provision for borrowed vehicles. I do not agree. The Business Auto policy defines an insured as follows: (a) you for any covered "auto;" and (b) anyone else while using with your permission a **covered "auto"** you own, hire or borrow. The policy then delineates five exceptions which do not apply here. Notwithstanding the well-reasoned argument of the defendants, there is no escaping the fact that the dump truck is not listed in item Three as a **covered "auto."** A **covered "auto"** is defined as one described in item Three of the Declarations for which a premium charge is shown. Reading subsections (a) and (b) together, it is clear that a covered auto would still have to be listed in item Three whether the policyholder owned it, hired it, or borrowed it. The dump truck was not listed in item Three, and thus cannot be considered a covered "auto." There is no ambiguity here.

Likewise, I am not persuaded by the defendants' argument that Cohick is an "insured" because of the language of the policy that provides, "anyone else while using

16

with your permission a **covered "auto"** you own, hire or borrow."  While it may appear that Cohick received permission to use the dump truck from Byler, the policyholder, the dump truck was still not listed as a covered auto, a requisite listed in the definition. Because, Cohick cannot be an insured under subsection (b), the defendants cannot find relief in subsection (c) to establish that Byler is also an insured as vicariously liable for the negligent acts of Cohick, his employee.

Accordingly, Brethren has no duty to defend and/or indemnify Defendants Byler and Cohick under the Business Auto policy it issued to Byler.

Brethren next argues that there is no coverage under the Farm Liability policy it issued to Defendant Byler because the dump truck does not qualify as "mobile equipment."  Instead, Brethren insists, the dump truck qualifies as a "motor vehicle," and as such is not covered under the Farm Liability policy.  It is undisputed that coverage exists under Brethren's Farm Liability policy if the dump truck is "mobile equipment" as defined under § 13 of the policy.  Thus, the crux of this case turns on whether the dump truck is "mobile equipment" under the terms of this policy.

Brethren insists that a simple reading of the definition of "mobile equipment" under the Farm Liability policy would lead to the conclusion that the dump truck is not "mobile equipment."  The dump truck is not a bulldozer, a forklift or a tractor.  Brethren contends that if an owner of the truck would seek information on using the dump truck in farming activities, there would be no such information found in the manufacturer's

17

Owner's and Driver's manual.  See Pl. Ex. M.  In fact, Brethren argues, the dump truck is referenced as a "vehicle" or "motor vehicle" throughout the Owner's and Driver's Manual, and never as "mobile equipment" or farm equipment.  It contends that not only was the dump truck designed primarily for use on public roads, it was *actually* used on public roads.

Brethren offers the opinion of Engineer George H. Meinschein who inspected the dump truck after the accident to determine the design and manufacturer's specifications, and made the following notes, *inter alia*:

> The [dump] truck that is the subject of this evaluation was manufactured in two stages. General Motors Corporation manufactured the incomplete vehicle as a cab and chassis that conformed to all the existing United States federal regulations that were applicable to motor vehicles with a Gross Vehicle Weight Rating of approximately 32,000 pounds.  The incomplete vehicle contained approved glazing, high and low beam headlamps, turn signals, brake lamps, tires, a single pedal to actuate all service brakes, horns, energy-absorbing steering column, windshield wipers, mirrors and seat belts.  In my opinion, General Motors Corporation manufactured the subject vehicle for use primarily on public roadways.  The manner in which General Motors Corporation intended the truck to be operated is detailed in the [dump truck] Owner's and Driver's Manual for the subject truck.

See Pl. Ex. L.  As the defendants point out, this report assumes, but does not establish by reference to any manual provision or other documentation, that the dump truck was intended to be operated primarily on public roadways.  It also assumes without proving that this particular type of truck is a "truck service" vehicle, as opposed to a "tractor

18

service" or combination "truck service – tractor service" type of vehicle. <u>See</u> Pl. Ex. M at 3. The dump truck Owner's Manual describes three types of gross vehicle weight rating plates: (1) one for a "Truck Service – Tractor Service;" (2) one for a "Truck Service;" and (3) one for a "Tractor Service." <u>Id.</u> Only a vehicle characterized in the Owner's Manual as a "truck service" is defined as "a motor vehicle designed primarily for the transportation of property or special purpose equipment, designed for uniform frame loading including pulling a full trailer." <u>Id.</u> Furthermore, even if the vehicle in question is a "truck service" type of vehicle, it is not defined in the manual as a vehicle designed for travel on public roads. Only the "truck service" rating plate specification makes reference to a motor vehicle. <u>Id.</u> The Owner's and Driver's Manual does not contain any definition of a land motor vehicle.

The defendants argue that there are genuine issues of material fact as to whether Brethren is obligated to provide coverage and defend and indemnify Defendant Byler under the "mobile equipment" provisions of the Farm Liability policy. Specifically, the defendants contend that genuine issues of material fact exist as to whether the dump truck constituted farm machinery designed for use principally off public roads and as an implement for cultivating and harvesting under § 13(a) of the Farm Liability policy so as to qualify as "mobile equipment." Likewise, they contend that genuine issues of material fact exist as to whether the dump truck was maintained primarily for purposes other than the transportation of persons or cargo under § 13(f) of the Farm Liability policy so as to

19

qualify as "mobile equipment."

Under Section 13(a) of the Farm Liability policy, bulldozers, forklifts and tractors constitute "mobile equipment."  However, the definition also includes "other farm machinery" where it is designed for use (1) principally off public roads; and (2) as implements for cultivating and harvesting.  See Pl. Ex. O at 13.  The terms "farm machinery," and "implements for cultivating harvesting" are not defined in the definitions portion of the Farm Liability policy.  Therefore, the court is required to use the plain meaning of the words.  Sheridan Broadcasting Networks, Inc. v. NBN Broadcasting, Inc., 693 A.2d 989 (Pa.Super. 1997).  An "implement" is defined as "a device used in the performance of a task – tool, utensil."  See Merriam-Webster's Collegiate Dictionary, 11th Ed. (2003).  "Cultivate" is defined as to "prepare or prepare and use for raising or crops."  Id.  Finally, "harvest" means "the act or process of gathering in a crop."  Id.

In considering the above definitions, the dump truck would qualify as "other farm machinery" within the meaning of Section 13(a) of the definition of "mobile equipment" under the Farm Liability policy.  Deposition testimony establishes that the dump truck was used as farm machinery on the Timothy Billig and William Dietrich Farms.  For example, it was used in the fields for bringing fertilizer and used for the removal or harvesting of silage from the fields.  Testimony of the witnesses established that the truck was regularly used in farm fields in the cultivation and harvesting of farm crops.  See Dietrich Dep. at 24-25; Byler Dep. at 23-24; Cohick Dep. at 63; T. Billig Dep. at 45-47,

20

86.  The truck served a number of farming purposes.  <u>See</u> Cohick Dep. at 78.  The truck

was used to transport fertilizer to the farm field.  <u>See</u> B. Billig Dep. at 84.  On several

occasions, the truck was used as an integral part of the silage harvesting operations on the

Dietrich farm.  <u>See</u> Dietrich Dep. at 24-25; Byler Dep. at 21; Cohick Dep. at 88.

The dump truck had multiple functions on the day of the accident.  Transporting

and hauling can be considered farming purposes.  These functions occurred both in the

field and on the road.  The dump truck was on public roads hauling between the two

farms of the defendants.  The silage operation could not have taken place without the

dump truck being in the field driven alongside the chopper and without it being on the

Byler farm.  Accordingly, there can be no dispute that the dump truck was used as an

implement for cultivating and harvesting based upon the deposition testimony of the

witnesses.

However, the second requisite to qualify as mobile equipment under Section 13(a)

is not so well-established.  To qualify, the dump truck must have been designed for use

principally off public roads.  In an attempt to satisfy its burden of establishing this

element, Brethren contends without supportive evidence that the dump truck was

designed principally for operation on public roadways.  However, according to the dump

truck Owner's and Driver's Manual, the truck may have been of the "tractor service" or

"truck service – tractor service" variety, rather than a "truck service" type of vehicle.  The

manual does not establish that any of these three types of service are designed for

21

principal on-road use.  Based upon the record as it stands, Brethren has failed to establish that a vehicle manufactured over thirty years ago, having a farm license plate, is not a vehicle designed principally for off public roads.  Furthermore, Brethren has failed to establish undisputed material facts that would entitle it to judgment as a matter of law that the dump truck cannot be considered "other farm machinery" designed for use principally off public roads and as an implement for cultivating and harvesting under the record as it exists.  This is especially true in light of the credible deposition testimony establishing that the dump truck was regularly used in farming operations for cultivation and harvesting.

Even if the dump truck does not qualify as "mobile equipment" under Section 13(a) of the Farm Liability policy, it nonetheless may qualify under Section 13(f) as "(v)ehicles not described in Sections (a), (b), (c) or (d) that are maintained primarily for purposes other than the transportation of persons or cargo."  There is no evidence of record, nor does Brethren contend, that the dump truck was maintained primarily for the transportation of persons.  The vehicle was maintained primarily for farming purposes and not for the transportation of persons.

There exist, however, disputed issues of material fact as to whether the vehicle was maintained primarily for the transportation of cargo.  The Farm Liability policy does not define "cargo."  Therefore, the ordinary meaning of the word must be examined.  Cargo is defined as "the goods or merchandise conveyed in a ship, airplane, or vehicle; freight."

<u>See</u> Merriam-Webster's Collegiate Dictionary, 11th Ed. (2003).  Another meaning is "goods carried commercially on a ship, aircraft, or truck."  <u>See</u> Compact Oxford English Dictionary, 3rd Ed. (2005).  Brethren maintains that the dump truck does not meet the definition of "mobile equipment" under 13(f) because all of the facts developed during the course of discovery establish, as a matter of law, that the dump truck was maintained primarily for the purpose of transporting cargo.  <u>See</u> Cohick Dep. at 25, 64, 78; Byler Dep. at 79; T. Billig Dep. at 20, 51, 85, and 87; Dietrich Dep. at 56, 74.  Brethren also insists that the use of a motor vehicle on a farm merely to transport commodities and/or cargo does not qualify the motor vehicle as farm equipment.

On the other hand, Defendant Byler maintains that the primary purpose of the vehicle was not to convey cargo or goods and merchandise commercially, but rather to convey farming products.  For example, at the time of the accident the dump truck contained silage, which was a harvested but unprocessed agricultural product intended to be used as animal feed for Byler's dairy farm.  He insists that farming products are clearly not "goods and merchandise."  The product being hauled was for his own use, not intended to be sold to the public, so it cannot be considered "freight."

In conclusion, the court cannot find, as a matter of law, that the dump truck involved in the accident is mobile equipment as that term is defined in the Farm Liability policy.  It has not been proven that the dump truck was maintained primarily for purposes other than the transportation of persons or cargo.  There is some evidence that the dump

23

truck was designed primarily for on-public-road use.  Other evidence points to the fact that the dump truck was especially used for its work in the fields, and its hauling of product on public roads was incidental.  Additionally, there is evidence that the dump truck was used primarily to transport or to haul, and thus could not be considered farm machinery.  Other testimony strongly supports a finding that the dump truck was used as an implement for cultivating and harvesting.  The court is not permitted to weigh these respective pieces of evidence when resolving a motion for summary judgment.  Rather, the court must conclude that reasonable fact-finders, viewing the competing evidence in the record, could come to different conclusions.  Accordingly, I will deny Brethren's motion for summary judgment.

An appropriate Order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **NATIONWIDE AGRIBUSINESS** | : | **CIVIL ACTION** |
| **INSURANCE COMPANY,** | : | |
| Plaintiff | : | |
| | : | |
| **v.** | : | **NO. 06-1604** |
| | : | |
| **BARETT N. BYLER, et al.,** | : | |
| Defendants | : | |

| | | |
|---|---|---|
| **THE BRETHREN MUTUAL** | : | **CIVIL ACTION** |
| **INSURANCE COMPANY,** | : | |
| Plaintiff | : | |
| | : | |
| **v.** | : | **NO. 06-5421** |
| | : | |
| **BARETT N. BYLER, et al.,** | : | |
| Defendants | : | |

**O R D E R**

**AND NOW,** this 31st day of March, 2009, upon consideration of Brethren Mutual

Insurance Company's motion for summary judgment (Document #27 of Civil Action No.

06-5421), and the responses of the defendants thereto, it is hereby ORDERED that the

motion is DENIED.

BY THE COURT:


 /s/ Lawrence F. Stengel
LAWRENCE F. STENGEL, J.